## WESTINGHOUSE ELECTRIC & MFG. CO. v. BROOKLYN RAPID TRANSIT CO. et al.

## CENTRAL UNION TRUST CO. OF NEW YORK v. SAME.

(District Court, S. D. New York. February 10, 1923.)

1. **Corporations** ⬥⇒471—**Bonds issued as part of same transaction in which money is secured are not issued for pre-existing debt.**

Where the creation of a debt and the subsequent issuance of corporate bonds as security therefor were parts of the same transaction, and practically contemporaneous, the bonds were not issued as security for a pre-existing debt.

2. **Corporations** ⬥⇒471—**Bonds issued as collateral for debt exceeding their face value held not shown to have been issued for less than par.**

Where a subsidiary · corporation had issued bonds for $60,000,000 to raise funds for improvements, and the parent corporation borrowed the money and pledged as security therefor the bonds issued by the subsidiary and also its own bonds of the par value of $10,000,000, and there was no showing as to the fair market value of the bonds of the subsidiary corporation, the bonds of the parent corporation cannot be declared invalid, because issued for less than their fair value.

3. **Corporations** ⬥⇒478—**Stock of subsidiary corporation held subject to mortgage.**

Where a mortgage executed by a corporation to secure its bonds covered property thereafter purchased, or acquired by or with the proceeds of the bonds, stock of a subsidiary corporation subsequently acquired directly by the issuance of bonds therefor is subject to the mortgage; it being immaterial that the bonds were directly delivered for the stock, instead of being sold and the proceeds paid for the stock.

4. **Chattel mortgages** ⬥⇒85—**Securities of corporation are not goods or chattels, within statute requiring filing of mortgage.**

Lien Law N. Y. § 90, as amended by Laws 1900, c. 248, § 1, providing that every mortgage of goods and chattels shall be void, unless filed, does not apply to a mortgage of stocks, bonds, and other securities, which are not goods or chattels.

5. **Corporations** ⬥⇒478—**Specification of property included held not to exclude securities covered by general language.**

Where a mortgage securing corporate bonds granted all the estate, property, rights, privileges, and franchises belonging to the corporation, including 17 parcels of real estate therein described, together with buildings, improvements, machinery, etc., the mention of the specific property did not operate to limit the mortgage to that property, so as to exclude from it securities owned by the corporation, which were not specifically mentioned.

6. **Chattel mortgages** ⬥⇒85—**Mortgage of securities not requiring their delivery to mortgagee held valid.**

Where a corporation executed a mortgage covering its securities to secure the payment of its corporate bonds, but the mortgage contained no provision that the stocks and bonds covered thereby were to be delivered to the lender on the day the loan was made, the mortgage was not required to be filed under Lien Law N. Y. § 90, as amended by Laws 1909, c. 38 (Consol. Laws, c. 33), which provided that the section providing that the requirement of filing should not apply to mortgage or pledge of, or lien on, stocks or bonds mortgaged or pledged to secure the payment of a loan, which stocks or bonds were to be delivered to the lender on the day such loan was made, and made such mortgage valid as against the creditors, with a proviso that, if the securities were not delivered, the mortgage should be filed.

⬥⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

7. **Mortgages** ☞199(2)—**Clause requiring notice to terminate mortgagor's right to income held not applicable to foreclosure by suit.**

In a corporation's mortgage to secure the payment of its bonds, which by its terms covered the income from the corporation's property, a provision permitting the corporation to receive the income until there has been a continuing default, which has been declared against the company, does not require the trustee to make a declaration of such default to become entitled to have the income impounded by filing suit to foreclose the mortgage, which suit was provided for by a separate article of the mortgage.

8. **Corporations** ☞482(½)—**Trustee under mortgage held entitled to income from date bill of foreclosure was filed.**

Where the receiver for a corporation was appointed in a suit by a general creditor, and thereafter the trustee under a mortgage applied for and was granted leave to file a bill of foreclosure, the trustee was entitled to have the income from the properties impounded for the benefit of the bonds secured by the mortgage from the date of filing the bill for foreclosure with leave of court, and not from the date of the extension of the existing receivership under the creditors' bill.

9. **Corporations** ☞471—**Bonds issued as collateral for smaller debt contracted at same time are valid.**

Under Stock Corporation Law N. Y. § 55, which incorporates the former statute relating to issuance of corporate securities as amended by Laws 1901, c. 354, which omitted the provision found in former statutes that bond should be issued at the fair market value thereof, it was no objection to the validity of the bonds that they were issued for a debt which was less than their face value.

10. **Corporations** ☞471—**Issuance of bonds as additional security called for by previous pledge is not issuance for pre-existing debt.**

Where a pledge of bonds, issued by the borrowing corporation as part of the transaction in which the money was borrowed, contained a provision that the pledgee might call for additional security at any time, the issuance of additional bonds as such additional security on renewal of the loan relates back to the original pledge, and becomes a part of the contemporaneous transaction, so that the bonds are not invalid as issued for a pre-existing debt.

11. **Corporations** ☞471—**Corporation and subsequent creditors cannot attack validity of issued bonds.**

Neither the corporation nor its subsequent contract creditors can attack the validity of bonds issued by the corporation and pledged as security for money loaned to it.

12. **Corporations** ☞561(1)—**Bonds authorized, but unissued, and issued as collateral and returned, are not free assets in hands of receiver.**

Bonds of a corporation, which were authorized, but never issued, and those which were issued by it and pledged to secure a loan, and returned to the corporation after the loan was repaid, are not free assets in the hands of the corporation, when a receiver is appointed therefor.

13. **Corporations** ☞561(1)—**Bonds are not extinguished by purchase by subsidiary and returned to corporation by merger, and hence they are free assets in hands of receiver.**

Where bonds of corporation had been issued by it and purchased by a subsidiary corporation, the return of the bonds to the ownership of the issuing corporation by a merger of the subsidiary corporation with it does not extinguish the bonds, in the absence of any intention thereby to cancel them, and hence such bonds are free assets in the hands of a receiver subsequently appointed for the corporation.

In Equity. Suit by the Central Union Trust Company of New York against the Brooklyn Rapid Transit Company and others, con-

solidated with a suit by the Westinghouse Electric & Manufacturing Company against the Brooklyn Rapid Transit Company and others, in which a receiver had been appointed for defendant corporations. On report of the special master as to foreclosure of first refunding mortgage held by the plaintiff Central Union Trust Company of New York. Master's report modified and sustained.

The following is the Report of Special Master E. Henry Lacombe, with certain parts omitted, as herein indicated:

The second cause above entitled is a suit to foreclose a mortgage of the defendant Brooklyn Rapid Transit Company, dated July 1, 1902, and known as first refunding gold mortgage, to secure an issue of bonds limited to an aggregate principal amount of $150,000,000, to mature July 1, 2002, and to bear interest at a rate of not exceeding 4 per cent. per annum. The cause came on before the District Court upon amended bill of complaint and various answers thereto. On October 20, 1920, that court ordered that the issues raised by said amended bill and answers be referred to the undersigned as special master, who was to hear proof and make report to the court of the same and of his conclusions thereon.

Said order further provided that the special master should give preference as to hearing of the proof touching certain specified issues and that he might, from time to time, make separate reports to the court upon such preferred issues. These preferred issues are specifically set forth in the order as relating to:

A. The execution and validity of the first refunding mortgage of Brooklyn Rapid Transit Company, the agreement between Transit Development Company, Brooklyn Rapid Transit Company, and Central Union Trust Company, dated March 29, 1907, and the indenture between Transit Development Company, Central Union Trust Company of New York, and Brooklyn Rapid Transit Company, dated July 24, 1918.

B. The amount of bonds validly outstanding under said mortgage.

C. Whether events of default thereunder have happened and the amount in default.

D. What real estate, stocks, bonds, certificates of indebtedness, and other property are subject to the lien of said mortgage, agreement, and/or indenture.

\* \* \* \* \* \* \* \* \* \*

F. Any other matters which may be relevant to the right of said plaintiff to foreclose for the benefit of the holders of first refunding bonds its lien upon said properties.

\* \* \* \* \* \* \* \* \*

In this report the several individuals, documents, etc., will be referred to as follows: The mortgage subject to this foreclosure suit as "refunding mortgage"; the trustee thereunder whether original or successor, as "refunding trustee"; the bonds issued thereunder as "refunding bonds"; the Brooklyn Rapid Transit Company as "B. R. T."; the Transit Development Company as "T. D."; the mortgage by B. R. T. to Central Union Trust Company, June 1, 1918, as "consolidated mortgage," and the trustee thereunder as "consolidated trustee"; the supplemental indenture B. R. T. to Central Union Trust Company, August 1, 1918, as "supplemental indenture"; the committee of contract creditors as "contract creditors"; the New York Consolidated Railroad Company as "Consolidated Railroad"; the New York Municipal Railway Corporation as "the Municipal"; the mortgage of B. R. T., dated October 1, 1895, as "first mortgage"; the agreement dated July 1, 1912, securing the six-year 5 per cent. notes of B. R. T., as the "note agreement"; the guaranty fund under the lease made by Brooklyn City Railroad Company to Brooklyn Heights Railroad Company as "guaranty fund"; "P. M." means printed minutes of the testimony before special master.

Preliminary Statement.

B. R. T. was incorporated January 18, 1896, under the Business Corporations Law of New York, for the general purposes expressed in its certificate of incorporation of furnishing power and equipment to railroads and other works, or assisting any corporation so to do, and with power to acquire, hold, and dispose of stocks, bonds, and other obligations of other corporations. The second of these purposes—i. e., the holding of the stocks and securities of corporations—constituted the sole corporate activity of B. R. T. from its organization until its merger with T. D. on August 1, 1918. At the time of this merger B. R. T. possessed and still possesses a large accumulation of stocks, bonds, and certificates of indebtedness and other obligations, hereinafter referred to, of local traction companies, controlling directly or indirectly through such ownership practically all the street surface railway lines, operating in Brooklyn and Queens, as well as the elevated lines of the Consolidated Railroad and the subway lines of the Municipal.

T. D. was incorporated under the Business Corporations Law on April 24, 1902, for the purposes, among other things, of supplying power and constructing and equipping railroads. All of its stock was owned by B. R. T. Thereafter, and on or about 1907, the various traction companies controlled directly or indirectly by B. R. T. found it inadvisable to maintain their own small and independent power plants, etc., as had been the practice up to that time, and they therefore entered into leases, contracts and pooling agreements with T. D., thereby obtaining the advantage of cheapened power and lowered repair and storage costs, which centralization and large scale production afforded. T. D. had early in its career become possessed of valuable real estate, and had acquired and developed extensive power, car repair, and storage facilities, and by virtue of the above-mentioned leases, contracts, and pooling agreements it became the lessee of substantially all the facilities theretofore possessed by the traction companies. On August 1, 1918, T. D. merged into B. R. T., which thereupon for the first time since its organization ceased to be a mere holding company and assumed the operating functions granted it by its charter.

On January 28, 1896, B. R. T. executed and delivered to a trustee (now succeeded by Equitable Trust Company) its mortgage, dated as of October 1, 1895, to secure an authenticated issue of $7,000,000 5 per cent. gold bonds.

On or about July 1, 1902, B. R. T. executed and delivered the refunding mortgage now in suit to secure an authorized issue of $150,000,000 100-year 4 per cent. gold bonds. Said mortgage was duly recorded in the office of the register of Kings county on July 9, 1902, and indexed against section 1, block 250, of the land map of Kings county. Apparently no one questions the proper execution or the validity of this mortgage. Whatever questions in reference to it have been raised before the special master relate only to its scope; i. e., whether certain specified items are or are not subject to its lien. The granting clause of this mortgage transferred and pledged to the refunding trustee all and singular the property and franchises of the said B. R. T. "whether now owned by B. R. T. or hereafter acquired by [it] with the proceeds of said bonds [the refunding bonds]." It includes particularly:

I. All the right, title, and interest which B. R. T. "now owns or *may hereafter acquire*" in and to the stock of *three* separately enumerated railroad *companies*, and *all other* shares of capital stock, *securities*, and bonds of any corporation, which are now owned by B. R. T., or which shall be *hereafter acquired* by B. R. T. *with the proceeds of bonds* issued hereunder. The five separately enumerated items of stock are: (a) Brooklyn Heights Railroad, 2,000 shares, the entire capital stock; (b) Nassau Electric Railroad, 85,000 shares common stock (the entire amount); (c) Nassau Electric Railroad, 60,520 shares, preferred stock; (d) Brooklyn Union Elevated Railroad, 110,707 shares, common stock; (e) Brooklyn Union Elevated Railroad, 46,411 shares, preferred stock.

II. All the right, title, and interest which B. R. T. "now owns or may hereafter acquire or become entitled to, * * * with all dividends, in-

come, interest and increase thereon" to the entire capital stock of Brooklyn, Queens County & Suburban Railroad Company, 20,000 shares, *subject*, however, to any interest of the Brooklyn City Railroad Company therein.

III. All net profits of, or in any wise derived or receivable by, the Brooklyn Heights Railroad Company, lessee under lease of February 14, 1893, by Brooklyn City Railroad, and also all other income of the Brooklyn Heights Company under said lease, after discharging its obligations under said lease. All right, title, and interest in and to the guaranty fund, then consisting of $2,000,000 par value of first mortgage bonds of Brooklyn, Queens County & Suburban Railroad Company and $1,627,000 par value of the first consolidated mortgage bonds of the Brooklyn City Railroad Company, provided under the terms of the above-mentioned lease and called the guaranty fund. [Note.—Further provisions of this paragraph need not be set forth in this part of the report.] All the net profits and all other net income derived or receivable by B. R. T. from Brooklyn Heights Railroad Company under or by virtue of any lease of contract with any and all other corporations with which leases or contracts now exist or may be hereafter made by the Brooklyn Heights Railroad Company.

IV. All right, title, and interest heretofore acquired and now owned, or hereafter acquired with the proceeds of bonds issued hereunder, by B. R. T. in and to the amount of the cost of all property, extensions, branches, additions, improvements, and equipment heretofore or hereafter acquired for use in connection with the operation of the railroads of Brooklyn Heights Railroad Company, Brooklyn City Railroad Company, Brooklyn, Queens County & Suburban Railroad Company, Nassau Electric Railroad Company, Coney Island & Gravesend, Railway Company, Sea Beach Railway Company, Coney Island & Brooklyn Railroad Company, or the B. R. T., pursuant and subject to the terms of leases or contracts heretofore or hereafter made between any two or more of said corporations, or between any one or more of said corporations, and any other corporation, or for use in connection with the operation of the railroads of any other corporation, stock of which may be owned now or hereafter by B. R. T.

On or about March 29, 1907, B. R. T. and T. D. entered into an agreement, which recited the execution on the same date of a mortgage by T. D. to the refunding trustee to secure payment of certain certificates of indebtedness of T. D. to be issued under said agreement. By its terms B. R. T. was to purchase from time to time from T. D. for a period of 10 years such certificates of indebtedness as may be tendered for sale, assignment, transfer, and delivery, paying therefor the principal amount of such certificate or indebtedness, provided such principal amount shall at the time be reasonably needed for the purpose of acquiring reasonably necessary equipments, betterments, additions, etc., to, or additional property of, the T. D. Total amount not to exceed $20,000,000. The money so advanced to be expended solely for the purposes mentioned. As each certificate is sold, and before another is tendered, the T. D. shall file with refunding trustee a detailed statement showing the purposes for which the money paid was expended. [Note.—Further excerpts from this document may be made later on in this report; those now given are sufficient for this preliminary statement.]

On or about the same date March 29, 1907, another agreement was entered into by T. D., B. R. T., and Central Trust Company, which was the trustee under refunding mortgage. It recites the execution of the refunding mortgage of 1902 and also the full text of the agreement between T. D. and B. R. T. last above set forth. It further recites that B. R. T. purposes and intends, in accordance with the terms and conditions of the refunding mortgage, to assign, transfer, and deliver to the refunding trustee the certain certificates of indebtedness which shall thereafter from time to time be acquired by B. R. T. from T. D. under the recited agreement, to be held by the trustee under the provisions of said mortgage, and that the B. R. T. proposes and intends to request of said trustee, from time to time, the authentication and delivery to it of bonds secured by said refunding mortgage of a principal not exceeding the actual cost to B. R. T. of the acquisi-

tion by it of the certificates of indebtedness so assigned, transferred, and delivered. It further recites that certificates of indebtedness (each bearing interest at 5 per cent. from its date, payable semiannually) amounting to $13,955,564.33, "have been heretofore issued, sold, assigned, and delivered by T. D. to B. R. T.," and by the latter to the trustee and are now held by the trustee under the provisions of the refunding mortgage. The certificates, are stated to be Nos. 1 to 39, inclusive, bearing date from August 28, 1902, to January 1, 1907.

The agreement further recites the consent of stockholders owning two-thirds of the stock of T. D. to the "execution and delivery of this mortgage," and that a certificate under seal of the T. D. has been subscribed and acknowledged. It further witnesseth that, in consideration of the premises and of $1, and "to secure the payment of the principal and interest of such of the certificates of indebtedness not exceeding * * * $20,000,-000, with interest thereon, *hereafter issued*, sold, assigned, transferred, and delivered by T. D. to B. R. T. under the said agreement of even date herewith, as shall be assigned, transferred, and delivered by B. R. T. to the trustee * * * under the provisions of" the refunding mortgage, and also to secure the payment of the principal and interest of all the certain certificates of indebtedness aggregating $13,955,564.33 and interest thereon, *heretofore* issued, sold, assigned, transferred, and delivered by T. D. to B. R. T., and by the latter to the trustee, to be held under the provisions of the refunding mortgage, the T. D. has and by these presents does grant, bargain, sell, assign, transfer, and set over to the trustee, its successors and assigns, "all and singular the property rights, privileges, and franchises of the T. D. whether now owned or hereafter acquired by the T. D., subject, however, to any existing mortgage or mortgages now of record covering said property and franchises or any part thereof, *excepting* and reserving, however, from the operation of this conveyance and mortgage, the following described parcels of lands with the improvements thereon. [Here follows an enumeration of 15 parcels of real estate.]"

Such conveyance is declared to be in trust for the security and protection of the trustee as holder of said certificates of indebtedness. [Note.—These excerpts are sufficient at this stage of the report. All others found to be material will be quoted infra.] This mortgage was duly executed. The stockholders' consent thereto, above mentioned, was recorded, but the mortgage itself was not.

On or about June 1, 1918, B. R. T. executed and delivered to Central Union Trust Company as trustee (the Columbia Trust Company has succeeded to this trusteeship) its consolidated and refunding mortgage, dated June 1, 1918, to secure an authorized issue of $150,000,000 bonds of which $29,-000,000 have been issued and are still outstanding. This mortgage was duly record in the office of the register of Kings county on July 26, 1918. It is not understood that its validity is questioned in this proceeding: it is in process of foreclosure, the record is complete, and it will be presented to the special master shortly after the disposition of this refunding mortgage proceeding. It may be said generally that it covers all property covered by the refunding mortgage as well as some additional property. Further details as to this mortgage may be found infra in connection with specific questions.

On or about July 24, 1918, T. D. executed and delivered to the refunding trustee its indenture of mortgage, to which B. R. T. was party of the third part. The consideration is stated to be "the assignment by the trustee to B. R. T. of the shares of capital stock of T. D. [constituting its entire capital stock] heretofore [date not given], acquired by B. R. T. and by it assigned to and pledged with * * * the trustee under the provisions of the refunding mortgage, such assignment being made to enable B. R. T. to merge into itself T. D., and in order as part of the same transaction to preserve and maintain unimpaired the lien of the refunding mortgage upon the property hereinafter described and represented by said shares of stock."

For this consideration T. D. grants, bargains, sells, aliens, etc., and sets over to the trustee, "all the estate, property, rights, privileges, and franchises (except the franchise to be a corporation) belonging to or owned by T. D. at the date of these presents, *including* the following described property, namely [here follows a description of 17 parcels of real estate], "together with all and singular the buildings, improvements," etc., "thereon * * * including also all engines, machines, * * * including implements," etc., "of every nature whatsoever, and all contracts, agreements, leases, leaseholds, terms, parts of terms, and rights under contracts, agreements, or leases which at the date of these presents belong to or are owned by T. D." These properties so conveyed are to be held "subject, however, to the lien of the certain agreement dated March 29, 1907," being the one hereinbefore in this report set forth.

The conveyance is declared to be in trust upon, and subject to the terms, provisions, and conditions, and subject to the rights, powers, and duties in the refunding mortgage, for the equal and proportionate benefit and security of all present and future holders of bonds and interest obligations issued under and secured by the refunding mortgage.

On or about August 14, 1918—the instrument is dated August 1, was signed and acknowledged August 14, recorded in Kings county August 16, and in Queens county August 18—B. R. T. executed and delivered to the trustee under consolidated mortgage of June 1, 1918, its indenture of mortgage supplemental thereto. The Columbia Trust Company is successor to this trusteeship. It recites the making of said consolidated mortgage, quoting article 6 thereof, which provides for what shall happen upon consolidation and merger of any one or more of the corporations mentioned. It further recites that on August 1 B. R. T., owning all the stock of T. D., merged into itself said T. D. and by virtue thereof became possessed of all T. D.'s property; that at the time of such merger all the shares of stock of T. D. were pledged under the consolidated mortgage, and "the trustee requires the execution and delivery of this supplemental indenture to further establish and perfect the lien of the consolidated mortgage upon the estate, property, rights, privileges, and franchises (not including cash, current accounts and current bills receivable, materials, and supplies) belonging to said T. D. Co. at the time of such merger."

The granting clauses cover "all and singular the estate, property, rights, privileges, and franchise (not including cash, current accounts, and current bills receivable, materials, and supplies) belonging to said T. D. at the time of the merger of said company on August 1, 1918, into the B. R. T. and which, by virtue of said merger, were on said date acquired by the B. R. T., *including* the following described property: [Here follows an enumeration of the 17 parcels of real estate set forth in T. D. mortgage of July 24, 1918.]" The conveyance is declared to be *subject* to the certain agreement of March 29, 1907; also to the mortgage dated July 24, 1918.

The B. R. T. covenants and agrees that the granting clauses of said consolidated mortgage of June 1, 1918, shall from the date hereof be regarded and taken to be enlarged, so as to include therein and thereunder the property herein described and conveyed and assigned, or intended to be conveyed or assigned, to the trustee, "subject to each and every of the trusts, liens, rights, powers, and duties under said consolidated mortgage dated June 1, 1918, that the property included thereunder was and now is subject to, and from henceforth the said consolidated mortgage shall be deemed supplemented by including therein and thereunder the property hereinbefore described, with the same force and effect as though said property had been originally described and included under said consolidated mortgage."

### Subjects of Controversy.

Before answering the six questions enumerated in the order, it will be well to state and dispose of the several subjects of controversy. Of all these it should be noted that they are concerned with financial transactions of New York corporations taking place in the state of New York. It is well settled that such controversies are to be disposed of in conformity with the

law of the state as determined by statute, as such statutes have been construed by the courts of the state. Supreme Lodge, Knights of P., v. Myers, 198 U. S. 508, 25 Sup. Ct. 754, 49 L. Ed. 1146 (1906). Thompson v. Fairbanks, 196 U. S. 516, 25 Sup. Ct. 306, 49 L. Ed. 577 (1905). In re Marine Construction & D. D. Co., 144 Fed. 649, 75 C. C. A. 451 (1906).

No one appears to dispute this proposition. It is a most wholesome rule. The attitude of different communities in this large aggregate of many states towards such questions is by no means uniform. In most of the states the old ideas as to usury still prevail; it is a defense to actions on negotiable instruments. In New York, however, upwards of 70 years ago, the Legislature adopted the modern and broader view, providing that "no corporation shall hereafter interpóse the defense of usury in any action." Laws 1850, c. 172, §§ 1 and 2. Later, by chapter 237 of the Laws of 1882, it further in substance provided that advances in excess of $5,000 on collateral security repayable on demand, should be free from the defense of usury. As the result of this last enactment, many a business concern owning valuable securities has been able to carry on through a period of general financial stress without having to sacrifice them at prices temporarily far below their value, and thereby possibly still further increasing the existing stress.

There are also variances in the provisions of law, applicable in different states, touching the issue of corporation bonds. In some they may be issued only at par; in others only for a sum not less than 75 per cent. or par; in others only at fair market value. In some states, also, these provisions have changed from time to time, becoming more liberal in some cases than they were before. An instance of this will be found when we come to consider the provisions of the statutes of New York.

### Status of Bonds.

In several of the briefs some of these bonds are referred to as "free cash" of B. R. T. The term is inappropriate and misleading. A corporation bond represents an obligation of the corporation, stating that the corporation is indebted to the bondholder in the amount named on its face, which it promises to pay on a specified date, with interest at a specified rate, which it also promises to pay from time to time at named dates. The bond further evidences the fact that a fund has been created and placed in the hands of a trustee, to be kept by said trustee and used to pay the bond, ratably with all other similar bonds, at maturity, or whenever through some default of the maker it may become due. "Free cash" of the maker is an awkward term to apply to such a bond, even if for some reason the individual holder be not able to collect upon it. The controversies as to these bonds are really, in the case of each bond, a controversy as to its status, whether or not it is enforceable agreeably to its terms.

Of the total authorized issue of $150,000,000 refunding bonds, $57,240,000 have been authenticated and delivered. Of this amount $29,619,000 were converted into B. R. T. stock and canceled, leaving $27,621,000, distributed as follows:

| | |
|---|---|
| $ 3,439,000 | in hands of the public. |
| 1,761,000 | owned by the Nassau Electric Railroad Company. |
| 7,079,000 | pledged as collateral to secure bank loans made prior to receivership. |
| 10,000,000 | pledged to secure B. R. T. 6-year 5 per cent. gold notes. |
| 250,000 | pledged under Brooklyn City Guaranty Fund. |
| 5,092,000 | in hands of B. R. T. at date of receivership. |

$27,621,000   total.

As to the bonds in the hands of the public and those owned by Nassau Electric Railroad Company, no controversy appears to be raised.

### Collateral to Bank Loans—$7,079,000.

These bonds were at different times pledged as collateral to notes given by B. R. T. to various banks and trust companies. All of these loans were

made subsequent to 1902, when section 55 of the New York Stock Corporation Law (hereinafter referred to) had been amended so as to read as it now stands. The notes were all in the usual form of collateral notes, providing that, when the market value of the collateral shrinks, the bank has the right to call for a payment on account or for such additional security as it may deem proper, and that on failure to respond to such call, or on the nonperformance of this promise, or on the nonpayment of the note or any other liability or liabilities of the maker to the bank, the bank is given full power and authority to sell and deliver or to collect the whole or any part of the above-named securities at any brokers' board, or at any public or private sale, at any time, or times thereafter, without demand, advertisement, or notice, and upon such sale may itself become the purchaser, applying the residue of the proceeds of sale (after deducting all expenses) to the payment of said liability or liabilities and returning the overplus to the maker of the note.

   \*       \*       \*       \*       \*       \*       \*       \*       \*       \*

The Mechanics' Bank also holds $250,000 of B. R. T. refunding bonds, deposited as collateral security for a note of the Nassau Electric Railroad Company for $75,000. No question appears to be raised as to the validity of these bonds or as to the Nassau's title to them. The People's Trust Company also holds $357,000 par value of B. R. T. refunding bonds as collateral security for a note of the Nassau Electric Railroad Company for $100,000. No question appears to be raised as to the validity of these bonds or as to the Nassau's title to them.

In all these cases (except that of Lawyers' Title & Trust Company) of loans to B. R. T. by banks or trust companies, the note now held is the last of a series. The following excerpt from the brief of Brooklyn Trust Company illustrates the usual sequence of events.

"The original loan of $300,000 was made July 6, 1916. The interest on the note was 4 per cent. It was secured by $455,000 face value B. R. T. refunding 4's. That note matured January, 1917, and was paid by check of the B. R. T. drawn on Brooklyn Trust Company. The old note was marked "Canceled," and a new note for $300,000 was made. The rate of interest on the new note was 4¼ per cent. It was secured by $455,000 B. R. T. refunding 4's. That note matured on July 6, 1917, and was paid on July 9, 1917, by check of the B. R. T. Company for the face amount, with accrued interest. Another loan was made of $300,000 at 5 per cent., secured by $550,000 par value of bonds; that is, $95,000 additional bonds were added to the collateral deposited for the original loan. That note matured on Jan. 9, 1918, but before the maturity of the note, and on November 13, 1917, additional collateral of $50,000 par value of bonds were deposited by Mr. Meneely (treasurer of B. R. T), with a letter of November 17, 1917, in evidence, which states that the additional collateral was deposited 'complying with your request.' That brought the total collateral up to $600,000. On the maturity of that note it was paid by check of the B. R. T. Company for $300,000 and accrued interest, and a new loan, made on January 9, 1918, of $300,000 at 6 per cent., secured by $600,000 refunding 4's. This note matured July 9, 1918, and was paid by check of the B. R. T. for $300,000 with accrued interest, and on July 9, 1918, a new note was given for $300,000 at 6 per cent. This last note matured on November 9, 1918. It was secured by $600,000 B. R. T. refunding 4's. On November 11, 1918, the note was paid by check of the B. R. T. for $300,000 and accrued interest, and on the same day a loan of $300,000 at 6 per cent. was made, maturing March 11, 1919. The collateral was $600,000 par value refunding 4's. On December 23, 1918, the Brooklyn Trust Company wrote to Mr. Meneely demanding additional collateral, and on December 26, 1918, such collateral was forwarded, consisting of $50,000 additional bonds. This note is due and outstanding and no interest has been paid."

All of the transactions were not exactly like this; for example, in the case of the Columbia Trust Company loan 455 bonds were pledged when the first note, dated July 26, 1917, was given and the additional 50 bonds were called for and deposited in conformity with the terms of that note

before it matured. It seems unnecessary, however, to rehearse the details of each separate transaction in this report for reasons which will be indicated infra.

There was testimony as to the value of these refunding bonds from time to time, as evidenced either by sales or by offers and bids. There is nothing to indicate that in any of these transactions there was anything unusual or different from well-recognized banking custom in financing collateral loans. In this city it is customary to require a surplus of 20 per cent. in the value of the collateral above the amount of the loan.

### Status of Bonds—Collateral to Bank Loans.

It is contended that the attempted pledge of *all* these bonds [held by the banks as collateral] is "invalidated by section 55 of the Stock Corporation Law (Consol. Laws, c. 59), for the reason that the pledgees are in no case required to account for the bonds, in case of the enforcement of the pledge, at substantially their principal amount." As to · approximately $2,155,000 of the total $7,079,000 it is further contended that the "attempted pledge is invalidated for the reason that they were deposited without consideration as security for antecedent debts." The section referred to reads as follows:

"Sec. 55. *Consideration for Issue of Stock and Bonds.* No corporation shall issue either stock or bonds except for money, labor done or property actually received for the use and lawful purposes of such corporation. Any corporation may purchase any property authorized by its certificate of incorporation, or necessary for the use and lawful purposes of such corporation, and may issue stock to the amount of the value thereof in payment therefor, and· the stock so issued shall be full paid stock and not liable to any further call, neither shall the holder thereof be liable for any further payment under any of the provisions of this chapter; and in the absence of fraud in the transaction the judgment of the directors as to the value of the property purchased shall be conclusive; and in all statements and reports of the corporation by law required to be published or filed, this stock shall not be stated or reported, as being issued·for cash paid to the corporation, but shall be reported as issued for property purchased."

The many counsel who have filed briefs have most exhaustively discussed both branches of this contention. A host of reported cases have been cited, carefully analyzed, and elaborately discussed. Very many of these are expositions of the law in other states, interesting, but not controlling, when we are concerned with the financial operations of New York corporations in New York state. Unless there be some ambiguity in the announcement by proper authority of the law of New York regulating the disposition of the bonds of a corporation, one need search no further for the rule to be applied in any concrete case. If confined to a consideration of the law of this state, the questions raised are greatly simplified.

Primarily the state Legislature regulates the proceedings of corporations. When the text of some such regulation expressed in a statute is obscure or ambiguous, or fails specifically to cover some particular proceeding, the decisions of the courts of the state are referred to to dispel the obscurity or ambiguity, or to fill the gap left in the statute. Confining attention, therefore, to the law of this state the following argument is submitted:

The statutes may be first referred to. In 1850 the Railroad Act (chapter 140) was passed. It authorized corporations "organized under· its provisions * * * from time to time to borrow such sums of money as may be necessary for completing and finishing or operating their railroad, and to issue and dispose of their bonds for any amount so borrowed, and to mortgage their corporate property and franchises to secure the payment of any debt contracted by the company for the purposes aforesaid." Section 28.

In 1881 the New York Court of Appeals in Duncomb v. ·N. Y., H. & N. R. R. Co., 84 N. Y. 190, held that the holder of $810,000 of bonds pledged as collateral for a debt of $81,000 was not limited to proof of an amount merely equal to the amount of his debt, but was entitled to share in the distribution accordingly up to the amount of his debt. To an argument

that the railroad corporation had no right to pledge its bonds as security for a precedent debt, as was done in that case, the court said: "But if the precedent debt was contracted in the process of borrowing money for the construction or operation of the railroad, we do not see that the purpose of the statute is at all violated or avoided. Its terms do not require that the borrowing and the issuing of the bonds should be simultaneous acts. The former may naturally and properly precede the latter." The B. R. T. was not organized under the provisions of the Railroad Act.

On June 7, 1890, by chapter 564 of the Laws of that year, entitled "the Stock Corporation Law," the Legislature provided in section 42 thereof as follows: "Sec. 42. *Must be Paid for in Cash; Exceptions.*—No corporation shall issue either stock or bonds except for money, labor done, or property actually received for the use and lawful purposes of such corporation, at its fair value, and all stock issued in violation of the provisions of this section shall be void."

In the same year, October 7, 1890, the New York Court of Appeals handed down an opinion in Gamble v. Queens County Waterworks, 123 N. Y. 91, 25 N. E. 201, 9 L. R. A. 527. That corporation had been organized under Laws 1873, c. 737, as amended by chapter 213 of the Laws of 1881, and therefore fell under the General Manufacturing Act of 1848 (Laws 1848, c. 40), which provided that the company could not issue its stock as fullpaid in payment for property purchased at anything less than its par value. The court states, however, that the case of a railroad corporation is different, and that any railroad could, under the statute, as was decided in Van Cott v. Van Brunt, 82 N. Y. 535, procure the building of its road and pay for it by the issuance of stocks and bonds, and might issue its bonds at actual value, even though it were less than par value. The opinion continues: "A different rule [from the rule requiring stock to be issued at par], however, prevails in regard to the bonds of a corporation. An extended discussion of the question is not needful. We think a corporation has the power to issue its bonds at less than par. 'So far as this point is concerned, it is not restricted to an issue only upon payment to the company of the par value of the bonds either in money or property for its use. * * * The principle decided in Curtis v. Leavitt, 15 N. Y. 1, gives validity to bonds thus issued. The repeal of the statute of usury, as far as regards corporations, operates to give validity to bonds negotiated at less than par. The case of Ellsworth v. S. L., A. & T. H. R. R. Co., 98 N. Y. 553, also impliedly holds that bonds thus issued are valid."

The reason given for this decision, viz. the repeal by the Legislature of the statute of usury so far as regards corporations (in 1850), made the decision applicable to all corporations. This opinion in the Gamble Case was, of course, before the Legislature in 1892, when it next revised the statute of 1890. Apparently it thought the better policy would be so to restrict the operation of this repeal of the statute of usury that it should not apply to corporations embraced within the provisions of the act of 1890. By chapter 688 of the Laws of 1892 entitled "An act to amend the Stock Corporation Law," it amended section 42 so as to read: "Sec. 42. *Consideration for Issue of Stock and Bonds.* No corporation shall issue either stock or bonds except for money, labor done or property actually received for the use and lawful purposes of such corporation. No such stock shall be issued for less that its par value. [No such bonds shall be issued for less than the fair market value thereof."

Nine years later the Legislature evidently changed its opinion as to the wisdom of this provision touching the issue of bonds. By chapter 354 of the Laws of 1901 it amended section 42 of chapter 688, Laws of 1892, so as to read: "Sec. 42. *Consideration for Issue of Stock and Bonds.*—No corporation shall issue either stock or bonds except for money, labor done or property actually received for the use and lawful purposes of such corporation."

The section contains some further provisions as to stock only. In this shape, with no special provision of its own as to bonds, and with the earlier provision that no bonds should be issued for less than their fair market value stricken out of the statute book, this section should be construed in

connection with the provisions repealing the statute of usury in the case of corporations, as the Court of Appeals had indicated in the Gamble Case. There has been no subsequent change in this section, so far as it concerns bonds. It is now section 55 'of the New York Stock Corporation Law, set forth in full, supra.

It is within the power of the Legislature to determine how, when, and for what amount the bonds of any corporation in the state shall be issued. When it has made a pronouncement by statute to such effect, and the pronouncement is comprehensive and unambiguous, it is controlling. It seems to the special master entirely obvious from the statute books that in 1901 the Legislature concluded, for some reason satisfactory to itself, that an existing provision of statute, forbidding the issue of bonds by corporations embraced within the New York Stock Corporation Law "for less than the fair market value thereof" was unwise, and therefore they repealed it.

The resulting situation is aptly described by the Appellate Division in the Second Department in MacQuoid v. Queens Estates, 143 App. Div. 134, 127 N. Y. Supp. 867 (1911), in the following language: "Prior to an amendment of 1901 (Laws 1901, c. 354, amending * * * Laws 1892, c. 688, § 42) the statute contained a provision as follows: 'No such bonds shall be issued for less than the fair market value thereof.' This qualification was deliberately omitted by the act of 1901. To attempt to reinstate it in the statute as it is now framed would be nothing less than new legislation. As the statute stood before 1901, it was held that the issuance of corporate bonds at a rice below their par or face value was a valid act, in the absence of fraud or breach of fiduciary duty; it being declared that the act of 1850, repealing the usury law as to corporations, enabled them to issue bonds at a discount. Gamble v. Queens County Water Co., 123 N. Y. 91, 108. Under the statute as it now stands, considering its language and its history, there seems to be no reasonable basis for the contention that the issuance of a corporate bond for a price less than its par value violates the statute. Memphis, etc., R. R. v. Dow, 120 U. S. 287."

The latest decision of the New York Court of Appeals to which reference is made on the briefs is Bankers' Trust Co. v. Denver Tramway Co., 233 N. Y. 604, 135 N. E. 936 (1922), modifying 192 App. Div. 794, 183 N. Y. Supp. 326. In that case a sinking fund mortgage provided that 1 per cent. should be paid into the sinking fund each year for all bonds "issued and outstanding." Some of the bonds had been issued only for the purpose of pledging them as collateral to bank loans. At what valuation they were pledged does not appear, but it may not unreasonably be presumed that the 20 per cent. custom above referred to was followed. The trustee sought to compel payment of 1 per cent. on these bonds as "issued and outstanding" and the tramway company, which had issued the bonds, contended that they were not issued and outstanding. The court said: "The bonds would not cease to be enforceable because in the hands of a pledgee. Duncomb et al. v. N. Y., H. & N. R. R. Co., 84 N. Y. 190, 200. The contributions to the sinking fund must be based upon the bonds which have acquired a legal inception, whether the disposition has been by pledge or otherwise. Of the bonds in controversy, $100,000 were in pledge on November 1, 1916, and $500,000 on November 1, 1918." Another New York case cited in support of the argument is Matter of Snyder, 29 Misc. Rep. 1, 59 N. Y. Supp. 993 (1899).

Coming now to the group of pledged bonds collateral to bank loans ($2,155,-000), as to which it is contended that the "attempted pledge is invalidated for the reason that they were deposited without consideration as security for antecedent debts": The general course of events is indicated in the statement, supra, as to the series of notes given to the Brooklyn Trust Company. In opposition to the contention it is argued, first, that the actual payment of one note before the new one was given makes each transaction a separate one; and, second, that, since the first note of each series (and each succeeding one) obligated the maker of the note to make good the security if the market value of the bonds shrunk, the original consideration was sufficient to sustain the whole series. The arguments seem to be sound,

but they need not be elaborated, because there is another and seemingly conclusive answer to the contention.

These bonds are negotiable instruments, and the New York Negotiable Instruments Law (chapter 43, Laws 1909 [Consol. Laws, c. 38]), provides in section 51 that "an antecedent or pre-existing debt constitutes value." This provision is taken from the earlier Negotiable Instruments Law of 1897, which was in force in 1902, when the refunding mortgage was made. In Kelso & Co. v. Ellis, 224 N. Y. 528, 121 N. E. 364 (1918), the Court of Appeals says: "Prior to the passage of the Negotiable Instruments Law, and from the time of the decision of Coddington v. Bay, 20 Johns. 637, it was the law of the state that, in order to constitute one a holder for value as indorsee of negotiable paper, it was necessary that he should part with some present consideration and that mere credit given on an antecedent debt was not such a consideration; but the Negotiable Instruments Law (section 51) provides that 'an antecedent or pre-existing debt constitutes value,' and thus brings the law of this state into harmony with that of the United States Supreme Court. Swift v. Tyson, 16 Peters, 1. * * * It is perfectly clear that for the sake of uniformity New York has abrogated the rule which had been in force since the year 1822."

In Railroad Company v. National Bank, 102 U. S. 14, 26 L. Ed. 61, the United States Supreme Court quotes from Swift v. Tyson, 16 Pet. 1, 10 L. Ed. 865, the clear and forcible exposition of the reason why this more liberal doctrine should be followed, as enunciated by Mr. Justice Story delivering the opinion of the court: "And why, upon principle, should not a pre-existing debt be deemed such a valuable consideration? It is for the benefit and convenience of the commercial world to give as wide an extent as practicable to the credit and circulation of negotiable paper, that it may pass not only as security for new purchases and advances, made upon the transfer thereof, but also in payment of and as security for pre-existing debts. The creditor is thereby enabled to realize or to secure his debt, and thus may safely give a prolonged credit, or forbear from taking any legal steps to enforce his rights. The debtor, also, has the advantage of making his negotiable securities of equivalent value to cash. But establish the opposite conclusion, that negotiable paper cannot be applied in payment of or as security for pre-existing debts, without letting in all the equities between the original and antecedent parties, and the value and circulation of such securities must be essentially diminished, and the debtor driven to the embarrassment of making a sale thereof, often at a ruinous discount, to some third person, and then by circuity to apply the proceeds to the payment of his debts. *What, indeed, upon such a doctrine would become of that large class of cases where new notes are given by the same or by other parties, by way of renewal or security to banks, in lieu of old securities discounted by them which have arrived at maturity? Probably more than one-half of all bank transactions in our country, as well as those of other countries, are of this nature. The doctrine would strike a fatal blow at all discounts of negotiable securities for pre-existing debts.*"

When the first note of a series was given by B. R. T. and bonds deposited as security, it was given for money. When it came due, one or other of two things happened. Either it was paid, and the original debt extinguished, the succeeding note of the series being given for money amounting to the same amount or, in some cases, to more or less, or else the original debt was not extinguished and the succeeding note was a renewal of the preceding one, which was a pre-existing debt, and under the statute a valuable consideration. The pledge of bonds as additional security for an existing loan or extension or renewal thereof does not increase the debt or obligation of the B. R. T. If a note is for $100,000, and the bonds deposited as collateral to secure it are entitled, upon liquidation of the trust estate, to a distributive share which aggregates $150,000, the holder of the note receives only $100,000 (and interest). The balance remains in the fund. No one apparently disputes this proposition.

The foregoing argument, set forth under this heading "Status of Bonds," in support of the validity of the pledges of these $7,079,000 bonds, is a mere

summary of the briefs of counsel who have discussed the question exhaustively. Such argument is found by the special master to be entirely persuasive, but he is sitting in the Second circuit, and the decision of the Circuit Court of Appeals, Second Circuit (In re Progressive Wall Paper Co., 229 Fed. 489, 143 C. C. A. 557, L. R. A. 1916E, 563 [1916]), is controlling of his determination of the questions submitted for his report. That court having before it the transactions of a New York corporation in New York state, held that corporation bonds "could not be pledged to secure payment of a pre-existing debt"; also that such bonds may be issued only "for. money borrowed at substantially their par value, or given in' exchange for labor substantially equal in value to the par value of the bonds, or given in exchange for property to be used for the corporate purposes of the corporation of substantially equal value to the par value of the bonds."

The briefs suggest that three of the important New York cases—Duncomb (84 N. Y.), Gamble (123 N. Y.), and MacQuoid (143 App. Div.)—were not brought to the attention of the Circuit Court of Appeals when the Progressive Wall Paper Case was decided, and that, had they been so brought to the court's attention, it might have reached a different conclusion. Such suggestion, however, is one which may be more appropriately brought to the attention of the court than to that of the special master. To do so involves ·no hardship to any one, since this report will undoubtedly be brought ultimately to the Circuit Court of Appeals, whatever may be its conclusions. The special master therefore feels himself constrained by the decision in the Progressive Wall Paper Case to report that the attempted pledges of the entire $7,079,000 bonds as collateral security on notes given to banks and trust companies are invalid.

"This conclusion would send them back to B. R. T. with the following result: Not having been issued, they are not outstanding. When, under foreclosure decree, the security fund is liquidated and its proceeds are to be distributed, no part of such proceeds would go to these unissued bonds. [Note.—The question whether the placing of a lien on them for receiver's certificates is in substance, a reissue is not considered at this point. It is referred to later.] The consequence might be that the proceeds of this security would show a surplus above the claims of all holders of issued bonds, and that such surplus would go to B. R. T. to be distributed as unincumbered property. That, however, would present a very different situation from the one implied in the proposition that the whole $7,079,000 is "free cash available for contract creditors."

"Moreover it is extremely doubtful whether there would be any such surplus on liquidation. Some of the securities pledged in this refunding mortgage fund may be impressed with a lien under the first mortgage; very many of them, substantially all such as were the property of B. R. T. when the consolidated mortgage was executed, are covered by the lien of that mortgage. Each of these liens, so far as it attached, would constitute a claim on items of the fund now under discussion superior to that of any unsecured creditors of B. R. T. The existence and extent of these claims will be definitely known only when the question reserved as to the first mortgage is answered and the hearing upon the consolidated foreclosure record is disposed of.

### Note Agreement Collateral—$10,000,000.

The note agreement, dated July 1, 1912, was entered into by B. R. T. and Central Union Trust Company, as trustee, to finance a separate corporation, the Municipal, which was to furnish and expend approximately $60,000,000 in the construction, reconstruction, and extension of various transit lines. The Municipal was to issue its own first mortgage bonds for that amount, and B. R. T. was to raise the money. To put itself in funds to do so, it issued its own six-year 5 per cent. secured gold notes under the note agreement. As collateral for said notes it deposited these $10,000,000 of its refunding bonds and also the first mortgage bonds of the Municipal.

On page 37 of the brief of contract creditors it is contended that the present holders of these $10,000,000 bonds (represented by the trustee under note agreement) are "not entitled to hold them as collateral, since, as between

B. R. T. and such holders, they were not issued in compliance with the requirements of section 55 of the Stock Corporation Law." Elsewhere in the brief it appears that the only facts alleged as showing noncompliance with section 55 are, first, that the bonds were issued for a pre-existing debt; and, second, that they were issued for a consideration less than their par value. In the case of these bonds collateral to the note agreement, however, it is obvious that there was no pre-existing debt. The creation of the debt (the loan of $60,000,000) and the issuance of the bonds were parts of the same transaction and practically contemporaneous.

As to the second ground, it is very difficult, in the absence of any evidence as to the value of the Municipal bonds (and there is no such evidence), to see how it can be found that the bonds were issued at less than their face value. When a loan of $1,000,000 is made, and bonds are put up as collateral to an amount 20 per cent. in excess of that sum, viz. $1,200,000, it might be said that the bonds are taken as collateral at less than their face value. But no such finding seems reasonable, when bonds of the face value of $10,000,000 are put up as collateral security for a loan of $60,000,000, and there is no testimony to indicate what was the value of other security which was put up at the same time.

It is well-settled law that B. R. T., which entered into this note agreement, could not itself attack its validity, nor the validity of the pledge of collateral under it. Union Loan & T. Co. v. Southern California, etc., Co. (C. C.) 51 Fed. 840; Sioux City Terminal R. & W. Co. v. Trust Co. of N. A., 82 Fed. 124, 27 C. C. A. 73; Id., 173 U. S. 99, 19 Sup. Ct. 341, 43 L. Ed. 628; Big Creek Gap C. & I. Co. v. American Loan & T. Co., 127 Fed. 625, 62 C. C. A. 351. Creditors of B. R. T., who became such subsequent to the execution of the note agreement, would seem to be in the same situation. Sioux City Terminal v. Trust Co., supra; Continental Trust Co. v. Toledo, St. L. & K. C. R. R. (C. C.) 82 Fed. 642; Central Trust Co. v. Columbus, H. V. & T. Ry. Co. (C. C.) 87 Fed. 815; Toledo, St. Louis & K. C. R. R. v. Continental Trust Co., 95 Fed. 497, 36 C. C. A. 155; Central Trust Co. v. Worcester Cycle Co. (C. C.) 110 Fed. 491; Graham v. Railroad Co., 102 U. S. 148, 26 L. Ed. 106.

These points are not further elaborated, because it is thought that the suggestions already made dispose of any question as to invalidity for the reasons assigned. The first of these reasons is that the bonds were issued for a pre-existing debt, when in fact there was no such debt. The second is that the bonds were issued for less than par, when there is no proof that they were so issued. The conclusion is reached that these $10,000,000 bonds are validly outstanding in the hands of the note agreement trustee.

### Collateral under Guaranty Fund—$250,000.

By the Brooklyn City-Brooklyn Heights lease of February 14, 1893, the lessee agreed to deposit a guaranty fund of $4,000,000 as a guaranty and security for the performance by it of all its covenants contained in the lease. It further agreed, upon lessor's request in writing, to make good any depreciation in the value of the securities constituting the fund. Interest on the securities was to be paid to the lessee until such time as the trustee should be notified in writing that the lessee was in default under the lease, in which event it was to be paid to lessor. The lessee further agreed that no dividends should be paid on its stock when the guaranty fund should be less than $4,000,000 in value. In the event of a breach of the lease, it was provided that guaranty fund should become the property of the lessor, as liquidated damages.

Subsequently, B. R. T. became the owner of all the stock of the Brooklyn Heights Company. In 1910 a dispute arose as to whether or not the guaranty fund had fallen below the stipulated amount. The lessor wrote that it had asked that measures be taken to restore the fund, and insisted that dividends had been paid on Brooklyn Heights stock, by transfer of surplus earnings to B. R. T. The dispute dragged along for a considerable time, arbitrators were appointed, and in March, 1913, a compromise was effected by the deposit by the Brooklyn Heights—actually B. R. T.—of $125,000 refunding 4 per cent.

bonds of Brooklyn City Railroad Company, $25,000 first mortgage B. R. T., and these $250,000 refunding bonds.

There is nothing to indicate that the termination, by the deposit of so small an amount of securities, of a controversy, in which the lessee (and its owner, B. R. T.) stood to lose so much if it were decided adversely, was not a proper, probably a wise, disposition to make of it. Why B. R. T. was not justified in using the Brooklyn City bonds and its own first mortgage bonds already issued, it is difficult to understand. But as to these $250,000 refunding bonds there was not an issue of them "for money, labor done, or property actually received." The most that can be said is that there was an actually pre-existing debt, although at the time Brooklyn Heights contended that nothing was due.

In view of the decision in the Progressive Wall Paper Case, the conclusion is reached that these $250,000 bonds are not validly outstanding in the guaranty fund.

### Bonds in Hands of B. R. T.—$5,092,000.

These bonds were all in the hands of B. R. T. when receiver was appointed; they may be divided into three groups:

A. $1,650,000 had continued uninterruptedly in the hands of B. R. T., until receivership, having never been sold, pledged, or disposed of in any manner.

B. $3,422,000 had at one time or another been pledged as security for bank loans negotiated by B. R. T. Prior to receivership all these loans had been paid off and the collateral returned to B. R. T.

C. $20,000 had been issued and sold by B. R. T., and had later been bought by T. D., then a subsidiary of B. R. T. They remained the property of T. D. until they passed into the treasury of B. R. T. upon the merger of the T. D. into B. R. T. on August 1, 1918.

It is thought that, when bonds duly authenticated and delivered against property pledged have been, by the corporation to whom they were thus delivered, sold outright to an outsider and issued to such outsider for a proper consideration, their status becomes definitely fixed for all time. Should the corporation buy them back again from an outside holder, such status remains unchanged, unless it is shown in some way that they were bought back with intention of canceling them, and to that extent extinguishing the bonded indebtedness. No such intention is shown here. The conclusion is reached that the status of the $20,000 bonds grouped under C is the same as that of bonds in the hands of the public, so far as right to participate in the proceeds of sale is concerned. Their numbers are stated to be "1053, 1593, 1640 to 1646, 6694, 10538, 12682, 12683 to 12685, 21063, 21082, 22154, 22536, 23506."

As to the status of authenticated and delivered bonds, which have not been sold outright, but have been merely deposited as collateral to secure some other and independent indebtedness of the corporation the conclusion is reached that when, because of the payment of such independent indebtedness, they are returned to the corporation without having been used to make good default in such payment, they return to their original status—having served their temporary purpose—as bonds authenticated and delivered by the trustee, but not issued. They might be issued as any other bond, therefore, unissued, might be issued; but until issued again they remain as they were before their first issue. Such conclusion would put groups A and B ($5,072,000) in the same status.

It is contended that in the case of such unissued bonds the appointment of receiver practically "freezes" them in the status they then occupy; that they cannot thereafter be issued so as to become outstanding bonds. On all these matters of controversy there have been submitted extended arguments. Such arguments, however, should be addressed, not to the special master, but to the court. Under decisions of the District Court, and the Circuit Court of Appeals, Second Circuit, the receiver has pledged all these bonds in the hands of B. R. T. as collateral to secure the issue of receiver's certificates. Presumably the same arguments here presented were presented to these tribunals, or could have been so presented. For the special master the status

of these bonds is fixed, and he reports them issued as collateral to the loan evidenced by receiver's certificates.

### The T. D. Agreement and Mortgage.

Question A, in the order under which this report is being made, asks for a report as to the execution and validity of the agreement between T. D., B. R. T., and Central Union Trust Company, dated March 29, 1907; also as to execution and validity of the indenture between T. D., Central Union Trust Company, and B. R. T., dated July 24, 1918. This question will be answered infra.

Upon this hearing the sole question argued in reference to these two documents was that, for reasons stated in the briefs, they were of no validity as against creditors, so far as they undertook to convey into the security fund of the refunding mortgage any property of the T. D. It seems, however, to the special master that, by reason of other facts appearing upon this record, such contention becomes academic. The refunding mortgage was executed July 1, 1902, and recorded July 9, 1902. Whether at that time B. R. T. owned any stock of T. D. does not appear. If it did, such stock was covered by the mortgage, which conveyed "all and singular the property of [B. R. T.] * * * now owned by [B. R. T.]"

Shortly after the execution of the mortgage B. R. T. proceeded to buy the whole stock—or, if it then owned some, the residue of the stock—of T. D. According to Exhibit 111 that purchase was made in 1902; the purchase price was $1,283,144.72. It was included (with other items) in a request for the delivery of refunding bonds, and such delivery was made December 3, 1902, and the stock bought was deposited with the trustee. Two trifling amounts were subsequently purchased, and similarly turned over, in March and July, 1907, prices being respectively $174 and $1,110.25. They are negligible.

In 1902, therefore, long prior to either of the T. D. documents referred to, B. R. T. was sole owner of the capital stock of T. D. and so continued until August 1, 1918, when T. D. merged into B. R. T. So far as anything in this record indicates, the stock of T. D. thus bought by B. R. T. was paid for with the proceeds of bonds. The witness Meneely testified that from time to time after the mortgage was executed *there were a certain number of bonds sold* from which the *proceeds were invested* in securities, certificates of indebtedness, *stocks,* and bonds. Then *afterwards, when the proceeds* of the bonds were *exhausted,* there were bought securities of various kinds from loans. In the face of this testimony, and of the fact that it appears from this exhibit that the purchased stock of T. D. was the very first item deposited after execution, it is difficult to escape the conviction that such purchase was made with the proceeds of bonds, presumably with the proceeds of the $5,000,000 delivered at the outset. The result would be that all the T. D. stock owned by B. R. T.—which was the entire amount of T. D. issued stock—was pledged under the refunding mortgage.

Even if it were questionable, on this record, whether the T. D. stock was acquired with bonds, or with the proceeds of bonds, the result would be the same. Although in several places in the mortgage after-acquired property is referred to as "hereafter purchased or acquired * * * by or with the *proceeds* of bonds issued under and secured by this indenture," the phrase must be construed as implying an acquisition by the bonds themselves, as well as by the proceeds of such bonds. Any other construction would be absurd. To illustrate: Let us suppose that some one owned a piece of real estate well fitted for the maintenance of a substation, required by B. R. T. system and well worth $300,000. The owner might agree to sell it for that price and to accept in payment B. R. T. refunding bonds at par; upon that basis the deal is completed. In that case the property would be acquired with bonds.

Suppose, also, that the transaction is somewhat different. The owner advances $300,000 to a third party, who buys with it $300,000 refunding bonds, which he turns over to the owner who advanced the money. The B. R. T. delivers the $300,000 it received from the third party to the owner who thereupon conveys the property. In that case the property would be acquired with

the proceeds of bonds. In both cases the result is that B. R. T. has acquired the property and the owner has received for it refunding bonds only. A construction which would require us to hold that, in the first case the property was not covered by the mortgage, and in the second case it was so covered, would be obviously absurd.

Although T. D. was a different legal entity from B. R. T. and was the legal owner of its own property, B. R. T. was in substance and effect the ultimate owner. "Courts of Equity will look behind the corporate fiction, and if it clearly appears that one corporation is merely a creature of another, the latter holding all the stock of the former, thereby controlling it as effectually as it does itself, it will be treated as the practical owner of the corporation, when necessary for the purpose of doing justice." U. S. v. United Shoe Machinery Co. (D. C.) 234 Fed. 127. See, also, McCaskill Co. v. U. S., 216 U. S. 504, 30 Sup. Ct. 386, 54 L. Ed. 590.

What is the result of this situation? Suppose that, at any time between 1902 and 1918, the B. R. T. sole stockholder had decided that T. D. should be dissolved and proceedings to that end had been taken, what would have happened to the property of T. D.? As a result of a judgment of dissolution either all its property, or sufficient of it to pay expenses of dissolution and all debts and obligations of T. D. of every sort and description, would be sold and such expenses and obligations paid. The residue of cash remaining and all property not sold would be turned over to its sole stockholder. If that stockholder had validly pledged his shares of stock to meet some obligation of his own, all that he received as the results of dissolution would be held to respond, so far as it might go, toward the liquidation of such obligation. Is there any real difference between the disappearance of a corporation having a single stockholder (also a corporation) through process of dissolution, or through merger? None occurs to the special master, and he is inclined to the conclusion that, even if neither of the T. D. documents were valid as against creditors, nevertheless, on the date of merger August 1, 1918, all T. D.'s property of every kind and sort, real and personal, passed to B. R. T. subject only to the claims of creditors of T. D. itself and, so far as this record shows, there are no such creditors.

The special master is not persuaded to the conclusion that the lien on the stock was lost when, at the time of the merger, paper certificates, which merely *evidenced* the ownership of the property which such stock represented, were physically temporarily parted with, to be later returned, transformed into new certificates evidencing ownership of the same property under a new name, such new name being that of the same person, who before such transfer was the ultimate owner of the property.

The special master has not had the advantage of any discussion of these points by counsel. Their arguments have been addressed to T. D. agreement and T. D. indenture. He may be mistaken in the conclusions of law he has drawn from the facts as he finds them; there may be some facts which he has overlooked, which might induce a different conclusion; there may be additional facts bearing on this subject which some one may wish to introduce. On the whole, however, it seems the wiser course to complete this report and file it. Additional points of law or items of fact may be introduced in one, or other, or both of the two hearings—as to first mortgage and consolidated mortgage—and final conclusions will presumably not be reached by the court until all three mortgages are before it.

## T. D. Agreement—March 29, 1907.

To this agreement T. D. was party of the first part, B. R. T. of the second part, and the refunding trustees of the third part. Its provisions are set forth supra in the preliminary statement. It was a mortgage by which T. D. undertook, for the reasons and purposes therein stated, to pledge with the trustee "all and singular the property, rights, privileges, and franchises of the T. D., whether now owned or hereafter acquired by the T. D.," except certain enumerated parcels of real estate. It appears from Exhibit 151 that there are a number of securities which were acquired by T. D. subsequently to

March 29, 1907. The contention is made that, since the mortgage was not recorded, nor the securities placed in the possession of the mortgagee, they are not covered by this mortgage. This contention also seems academic; there is not a single security, stock, bond, certificate of indebtedness, or what not within the text of the mortgage of March 29, 1907, and then owned by T. D., or a single one subsequently acquired by T. D. which is not within the text of the mortgage of July 24, 1918. If that agreement is valid, it is immaterial what happens to the mortgage of 1907.

In support of the contention that this mortgage of 1907 (for in substance and effect it was a mortgage) was void as against creditors, reference is made to the Lien Law as it stood in 1907. Section 1 of chapter 248, Laws of 1900 provides that section 90 of chapter 418 of the Laws of 1897, entitled "An act in relation to liens," is hereby amended to read as follows: "Sec. 90. *Chattel Mortgage to Be Filed*—Every mortgage or conveyance intended to operate as a mortgage of goods and chattels or of any canal boat, steam tug, scow or other craft, or the appurtenances thereto, navigating the canals of the states, which is not accompanied by an immediate delivery, and followed by an actual and continued change of possession of the things mortgaged, is absolutely void as against the creditors of the mortgagor, and as against subsequent purchasers and mortgagees in good faith, unless the mortgage, or a true copy thereof, is filed as directed in this article."

Turning now to the original section 90 of chapter 418 of the Laws of 1897, it appears to be identical, even as to punctuation, with the text of the alleged amendment. Why the Legislature thought it desirable to use so many words to express its conclusion that the original section 90 should *not* then be changed in any way does not appear. As thus unchanged it was the law of the state in force when this agreement of 1907 was executed. The stocks, bonds, and other securities which are the subject-matter of discussion here are not "goods" or "chattels." The conclusion is reached that as to them this agreement of 1907 was a valid mortgage.

### T. D. Mortgage—July 24, 1918.

The provisions of this document have been set forth in the Preliminary Statement. It is contended that it was not intended to include stocks and bonds; the ground of the contention apparently being that such securities are not specifically enumerated, although the document contains "17 pages of minute specification of the items of property intended to be included in the indenture." The quotation does not quite accurately state the provisions of the granting clause. The 17 pages of minute specifications do not profess to be a statement of "*the* items intended to be included," but of *items* intended to be included—obviously with other items. The granting clause begins with the comprehensive statement: "All the estate, property, rights, privileges, and franchises (except the franchise to be a corporation) belonging to or owned by the T. D. at the date of these presents." Surely this language is broad enough to cover stocks, bonds, certificates of indebtedness, and other securities of the kind with which we are here concerned. The T. D. owned also at the time 17 parcels of real estate, and it would be natural in a document of this sort to describe them quite fully. It is not surprising, therefore, to find the above-quoted comprehensive statement followed by the words, "including the following described property namely," and a description by metes and bounds of each of the 17 parcels of real estate.

The construction to be given to the word "including"—namely, that it implies that whatever is thereafter enumerated is to be *included with something else*—was discussed in the special master's ad interim memorandum in Municipal foreclosure, dated February 10, 1922.[1] This elaborate description

---

[1] Ad Interim Memorandum of Special Master in Municipal Foreclosure.

*First Question—Date of Impounding Income.*—Among the property enumerated in the granting clause there is included: "All tolls, income, and revenue arising from the operation of the railroads and property which at any time the company has the right to operate." And the mortgagor in article V "ex-

of the 17 parcels of real estate is followed by the words: "Together with all and singular the buildings, improvements, power houses, substations, repair shops, machine shops, emergency crew stations, depots, structures, fix-

---

pressly pledges hereunder all revenue, income, and profits received and to be received under the city contracts, the operating contract, and from every other source." There is also the usual clause (section 1 of article XI) permitting the mortgagor, until the happening of an event of default, to operate the property and to collect, receive, take, use, and enjoy the tolls, earnings, income, rents, issues, and profits thereof. In the event of default the mortgagee may enter into and upon the trust estate and exclude the company therefrom, and may use, operate, manage, and control the same and conduct the business; or, in the event of default, the mortgagee may proceed to protect and enforce its rights by a suit or suits in equity or at law.

As to certain items of the net income, rents, and profits of the property, both parties agree that the trustee plaintiff is entitled to so much as accrued before that date. The controversy between them is as to the date when it shall be held that income was impounded.

On December 31, 1918, all the property of the Municipal passed into the possession and control of the District Court, which appointed Lindley M. Garrison as receiver thereof. This was under creditors' bill, brought by the Westinghouse Company, on behalf of itself and of all creditors of the defendant therein who may thereafter join in the prosecution of the suit. On February 20, 1919, the trustee filed its petition, duly verified, in such creditors' suit, alleging the execution of the mortgage and defaults thereunder, and praying leave to file a bill in foreclosure, which it submitted with its petition. The bill prayed that the appointment of the receiver under creditors' bill be extended to the foreclosure suit, and that such receiver be appointed as receiver of all property covered by the mortgage, including earnings, income, and proceeds, with power to preserve and to secure the earnings and income of said property, assets, and franchises to the use of the plaintiff in foreclosure and the holders of the first mortgage bonds. The petition stated that application was made to the federal court, because the property covered by the mortgage was now in the possession of that court, by reason of the prior appointment of Mr. Garrison as receiver of the Subway (Municipal Railway) Company, of the Consolidated Company, and of the Transit Company.

On the same day, February 20, 1919 (it appears to be misprinted "February 19 on page 463, volume I of the Record of Proceedings), an order was made granting said petition and giving directions as to serving notice of all subsequent proceedings. The bill of foreclosure was not actually filed until March 1, 1919 (Record, volume I, page 619), for the reason, as stated in the trustee's brief of facilitating accounting by not breaking up a month's figures. On April 21, 1919 (Record of Proceedings, volume II, page 281), this court ordered that the foreclosure suit be consolidated with the creditors' suit, that the appointment of receiver theretofore made in the last-named suit be extended to the foreclosure suit and to "all the assets and property of * * * New York Municipal Railway Corporation * * * embraced in the mortgage"; that the powers of the receiver be also extended to the foreclosure suit, so that said receiver shall act as receiver in the foreclosure suit. Under this state of facts the trustee plaintiff in the foreclosure suit contends that the date from which income was impounded should be held to be March 1, 1919; the contract creditors' committee contends that it should be April 21, 1919.

In support of its contention counsel for Contract Creditors cites: N. Y. Security & T. Co. v. Saratoga Gas & El. Co., 159 N. Y. 137, 53 N. E. 758, 45 L. R. A. 132; Platt v. N. Y. & Sea Beach R. Co., 170 N. Y. 451, 63 N. E. 532; Central Trust Co. v. Morton Trust Co., 200 N. Y. 577, 93 N. E. 975; In re Clark Realty Co. (C. C. A. 7th) 234 Fed. 576, 148 C. C. A. 342; London-Arizona C. Co. v. Gila C. S. Co. (D. C.) 257 Fed. 324; Gilman v. Illinois-Mississippi T. Co., 91 U. S. 603, 23 L. Ed. 405; American Bridge Co. v. Heidelbach, 94 U. S. 798, 24 L. Ed. 144; Sage v. Memphis & Little Rock R. R., 125 U. S. 361, 8 Sup. Ct. 887, 31 L. Ed. 694; Fosdick v. Schall, 99 U. S. 235, 25 L. Ed. 339; Ames v. Union Pac. R. R. (C. C.) 73 Fed. 49; Dow v. Memphis & Little Rock,

tures, rights, privileges, interests, hereditaments, appurtenances whatsoever, unto any of the hereby granted and demised premises and estates belong and appertaining, which belong to or are owned by the Development Company

124 U. S. 652, 8 Sup. Ct. 673, 31 L. Ed. 565; Westinghouse Electric & M. Co. v. Idaho R. Co. (D. C.) 228 Fed. 972; Rochester Distilling Co. v. Rasey, 142 N. Y. 570, 37 N. E. 632, 40 Am. St. Rep. 635; Pennsylvania Steel Co. v. N. Y. City Ry. (C. C. A. 2d) 231 Fed. 442, 145 C. C. A. 436; Am. Brake Shoe Co. v. N. Y. Railways (D. C. S. D. N. Y., Nov. 21, 1921) 277 Fed. 261. In the case last cited, the question here presented was not raised or discussed, the disposition made of income was "conceded by counsel."

Counsel for trustee cites the following authorities: Fletcher, Cyc. of Corporations, vol. 8, p. 8976; Cook, Corporations (7th Ed.) vol. 4, p. 3216; Hook v. Bosworth (C. C. A. 7th) 64 Fed. 443, 12 C. C. A. 208; Farmers' Loan & T. Co. v. Detroit B. C. R. R. (C. C.) 71 Fed. 29; Ames v. Union Pac. Ry. Co. (C. C.) 73 Fed. 49; Farmers' Loan & T. Co. v. Am. Waterworks Co. (C. C.) 107 Fed. 23; In re Chase (D. C.) 133 Fed. 79; Chicago & A. R. R. Co. v. U. S. & Mexico T. Co. (C. C. A. 8th) 225 Fed. 940, 141 C. C. A. 64; In re Clark Realty Co. (C. C. A. 7th) 234 Fed. 576, 148 C. C. A. 342; Sage v. Memphis & Little R. R. R., 125 U. S. 361, 8 Sup. Ct. 887, 31 L. Ed. 694; U. S. Trust Co. v. Wabash Ry., 150 U. S. 287, 14 Sup. Ct. 86, 37 L. Ed. 1085; Galveston R. R. v. Cowdrey, 11 Wall. 459, 20 L. Ed. 199; Dow v. Memphis R. R. Co., 124 U. S. 652, 8 Sup. Ct. 673, 31 L. Ed. 565; Atlantic T. Co. v. Dana (C. C. A. 8th) 128 Fed. 209, 62 C. C. A. 657; Westinghouse Elec. & M. Co. v. Idaho Ry. (D. C.) 228 Fed. 972.

These decisions are not entirely harmonious. In several of them the absolute possession and control of the mortgaged property had remained entirely undisturbed in any way when the bill of foreclosure was filed. The mere filing of the bill did not actually interfere with such possession and control. In the case mainly relied upon by the contract creditors—N. Y. Security & T. Co. v. Saratoga Gas & Elec. Co., supra—a creditor's action and a foreclosure suit had both been begun, but until November 16 nothing actually interfering with the mortgagor's possession and control had taken place. On November 16 the court appointed a receiver simultaneously in both suits.

It may be noted that the ousting of an owner from possession and control of its property, through seizure by the court and the installation of the court's officer with full authority to operate, manage, and use the property produces one obvious change in the situation. The clause, usually found in mortgages, as it is in this one, providing that in the event of default, the mortgagee may enter into and upon the trust estate, exclude the mortgagor therefrom, and use, operate, and control such estate, is rendered wholly nugatory. The mortgagee can protect his rights only by applying to the court which has the sole possession and control of the property.

It may also be noted that when a court has full possession and control of the property of a mortgagee, through a receiver by it appointed, whether under a creditors' bill or a foreclosure suit on some other mortgage, and application for leave to intervene is granted to a party asking to foreclose a mortgage and praying in his bill for the appointment of a receiver, and a trial of his suit, the designation of a receiver is practically a matter of course, although the court may not at once decide whether it will extend the existing receivership, or for some administrative convenience will appoint an additional receiver in foreclosure. In an enumeration of what acts will operate to impound income for the benefit of mortgage bondholders, when the mortgaged property has been placed in the hands of a receiver appointed by a court, before the commencement of a suit to foreclose the mortgage, the Circuit Court of Appeals, Eighth Circuit in Chicago & Alton R. Co. v. U. S. & Mexico Trust Co., supra, expressly includes "an intervention [actually] made in the earlier suit." To the same effect are Atlantic Trust Co. v. Dana, and In re Clark Realty Co., supra.

The proposition that the question is one of local law is accepted; but the special master does not find among the decisions cited from the state reports one which discusses and disposes of the precise question presented by the

at the date of these presents, and the reversions and remainders, rents, issues, and profits thereof, and all the estate, right, title, interest, possession, claim, and demand of every nature and kind whatsoever of the Development Company, as well at law as in equity, of, in, and to the same, and every part and parcel thereof, including also all engines, machines, machinery, mechanisms, boilers, wires, conduits, tools, implements, vehicles, rolling stock, live stock, apparatus, equipment and devices of every nature whatsoever and all contracts, agreements, leases, leaseholds, terms, parts of terms, and rights under contracts, agreements, or leases, which at the date of these presents belong to or are owned by the Development Company."

It is quite obvious, as the contract creditors contend, that stocks, bonds, and certificates of indebtedness are not enumerated in this long list last above quoted of property used in connection with the railway system. But it by no means follows that this enumeration, which is prefaced by the word "including"—not, as in many other instruments which have been before the courts, by the words "that is to say," or "namely"—may by any reasonable construction be held to negative the broad language with which the granting clause begins.

Moreover, if there were any doubt as to the intention of the parties to cover by this mortgage all the estate and property of T. D., it would be resolved by reference to the recitals. There it is stated that B. R. T. had theretofore acquired the entire capital stock of T. D., had assigned and pledged it to the trustee under the provisions of the refunding mortgage, and that the trustee was about to reassign said stock to B. R. T. to enable it to merge T. D. into itself. The object of this T. D. mortgage of June 24, 1918, is then stated to be "in order as part of the same transaction to preserve and maintain unimpaired the lien of the refunding mortgage upon the property hereinafter described and *represented by said shares of stock.*"

In the "property * * * represented by said shares of stock"—the entire capital stock of T. D.—there were certainly included, not only the real estate and the items listed in the long enumeration last above quoted, but also all the stocks, bonds, or other securities which T. D. owned on July 24, 1918. This T. D. mortgage of July 24, 1918, did not include after-acquired property. There was no after-acquired property, acquired by T. D. between the date of this mortgage and the merger, when T. D. ceased to exist.

In support of the contention that this mortgage was void as against creditors, reference is made to the Lien Law as it stood in 1918. By chapter 38, Laws of 1909 (Consol. Laws, c. 33), the Lien Law was revised and re-enacted, section 90 of the act of 1897 becoming section 230 of the new law. Such section, containing the provisions of old section 90, is quoted supra. By chapter 326, Laws of 1911, and section 1, chapter 348, Laws of 1916, section 230 of the Lien Law was amended by adding to the existing section (already quoted, supra) the following provisions:

"This article shall not apply to agreements creating liens upon merchandise or the proceeds thereof for the purpose of securing the repayment of loans or advances made or to be made upon the security of said merchandise and the payment of commissions or other charges provided for by such agreement, where the conditions specified in section forty-five of the personal property law are complied with, nor shall this article apply to the mortgage or pledge of or lien upon stocks or bonds mortgaged or pledged to secure payment of a loan, which stocks or bonds, by the terms of a written instrument creating such mortgage, pledge or lien and setting forth the conditions of such loan, are

---

facts of this case. There is a substantial difference between the facts in the leading case relied on, the Saratoga Gas & Electric Co. Case, and the facts hereinabove recited. That being so, and the reasoning in the federal decisions, which deal with a situation like the present, being found persuasive, the conclusion is reached that the date of impounding income is the day when the court, having theretofore ousted the mortgagor and itself having through its receiver sole possession and control of the property, allowed the mortgagor to file the bill, which declared defaults under mortgage and asked that the receivership be extended to cover its rights under the mortgage. That date is the date the bill of foreclosure was filed, March 1, 1919.

to be delivered to the lender on the day such loan is made, and every such mortgage, pledge or lien, of such securities, shall be valid as against creditors of such mortgagor or pledgor, provided, however, that if such securities are not delivered to the pledgee or mortgagee on the day such loan is made, the mortgage, lien or pledge therein intended to be created shall be absolutely void and of no effect as against the creditors of such mortgagor, pledgor or lienor unless such instrument, or a true copy thereof, is filed as directed in this article, on the day following the making of such loan, and provided also that every such mortgage, pledge or lien shall be absolutely void as against purchasers pledgees or mortgagees in good faith of such stocks or bonds provided such stocks or bonds are delivered to such purchaser pledgee or mortgagee at the time of such purchase, pledge or mortgage."

The conclusion is reached that the additional provisions of section 230 do not apply to this mortgage of July 24, 1918. It does *not* create a lien upon merchandise or the proceeds thereof. The terms of the written instrument do *not* provide that the stocks and bonds covered by the mortgage are to be delivered to the lender on the day the loan is made. And the further conclusion is reached that the T. D. mortgage of July 24, 1918, is valid as against creditors.

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*

As to income of all the properties subject to the lien of the refunding mortgage: It is contended that income was not impounded by the beginning of foreclosure because of the provision of section 2 of article 3 of the mortgage, which reads as follows: "Unless there shall be some continuing default that shall have been declared against the transit company as provided in section 3 of article 3 of this mortgage and written notice thereof given to the trustee, the transit company, from time to time, shall be entitled to receive and collect all dividends, income, interest, rents, and profits which shall arise or accrue from any of the stocks, bonds, securities, and property, which, or an interest in which, is or shall be covered by this mortgage, and the trustee shall do all things reasonably necessary to authorize and enable the transit company to collect such income, interest, dividends, and rents, and shall pay over to the transit company all such interest, income, dividends, and rents received by the trustee. \*    \*    \* "

Section 3 of article 3, referred to in the above quotation provides that if, after demand the B. R. T. shall make default in the payment of interest upon any of the refunding bonds, and if such default shall continue for six months after the demand, the trustee may (and upon the request of holders of a certain percentage of the bonds shall) by a notice in writing addressed to B. R. T. declare the principal to be due. The trustee has made no such declaration.

The conclusion is reached that this provision is in no way concerned with foreclosure by suit, which is provided for in section 4. There is nothing to indicate that it was intended to undertake the regulation of such a suit by the court, in which it might be brought, otherwise than in accordance with the well-settled practice in such proceedings. Impounding of income is a usual, orderly step in such proceedings.

There is a dispute as to which date should be taken as the one from which the income of all properties subject to the lien should be impounded—whether it should be July 14, 1919, the date of filing the bill of foreclosure, or August 26, 1919, the date of the extension of the existing receivership under creditors' bill. A similar question was presented and discussed in the ad interim memorandum of the special master, dated February 10, 1922, in the proceeding to foreclose the first mortgage Municipal Railway Corporation.

For reasons therein stated the conclusion is that the income of all properties embraced in this refunding mortgage subsequent to July 14, 1919, should go to the trustee.

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*

Chadbourne, Hunt & Jaeckel, of New York City (William M. Chadbourne and Frank Marsh, both of New York City, and Carroll R. Ward, of Springfield, Mass., of counsel), for committee of contract creditors of Brooklyn Rapid Transit Company.

Larkin, Rathbone & Perry, of New York City (Henry V. Poor and

James L. Banks, Jr., both of Ney York City, of counsel), for Central Union Trust Co.

Rumsey & Morgan, of New York City (John Hill Morgan and Henry N. Arnold, both of New York City, of counsel), for Franklin Trust Co., now Bank of America.

Davies, Auerbach & Cornell, of New York City (Harold C. McCollom and Louis F. Schwartz, Jr., both of New York City, of counsel), for Columbia Trust Co.

Martin A. Schenck, of New York City, for Columbia Trust Co., individually.

' Zabriskie, Sage, Gray & Todd, of New York City (George Zabriskie and Dean Sage, both of New York City, of counsel), for bondholders' protective committee.

Cravath, Henderson, Leffingwell & DeGersdorff, of New York City (Paul D. Cravath, Robert T. Swaine, and Stephen A. Van Ness, all of New York City, of counsel), for noteholders' committee.

George S. Franklin, of New York City (George S. Franklin and H. Bartow Farr, both of New York City, of counsel), for War Finance Corporation.

Laughlin, Gerard, Bowers & Halpin, of New York City (Frank C. Laughlin, Spotswood D. Bowers, and Stewart W. Bowers, all of New York City, of counsel), for bondholders' protective committee, in part.

Cullen & Dykman, of New York City (William N. Dykman and S. B. Olney, both of Brooklyn, N. Y., of counsel), for Brooklyn Trust Co.

Wingate & Cullen, of New York City (Conrad Saxe Keyes, of New York City, of counsel), for the People's Trust Co.

Harold Swain, of New York City, for Title Guarantee & Trust Co.

MAYER, Circuit Judge. This is a motion to confirm the report of the special master in respect of the foreclosure of the so-called first refunding mortgage of Brooklyn Rapid Transit Company. The questions in controversy were fully and carefully presented to the special master, and in some respects have been even more fully argued before this court. If a reorganization shall be effected, many and perhaps all of the questions dealt with by the special master and here argued will become academic for all practical purposes. Yet this and the other foreclosure suits in the B. R. T. System have presented some questions which are of importance wider than the particular rights here involved.

It is desirable that, so far as practicable, these questions should be decided; for such decisions, whether of the appellate courts or of this court, may be helpful to those hereafter confronted with problems of the same general character, just as the decisions of the Circuit Court of Appeals of the Second Circuit and of the District Court for the Southern District of New York in the Metropolitan Street Railway receiverships have been of service in this and other pending transit corporations receiverships. Indeed, although much complaint is made, and doubtless with good reason, of the growing volume of opinions, this court has found it helpful and sometimes necessary, from time to time, to resort to unreported master's reports and to records in the Metropolitan receiverships for procedure and precedent.

[1-8] It will not be necessary to repeat at length the reasons and conclusions of the special master (former Judge Lacombe) in those respects in which the court agrees with his conclusions. It may be that, in some instances, the same result may be reached by a different course of reasoning but the situation is not one which calls for academic discussion. The thorough and able opinion of the learned special master (noted, with some details omitted, in the statement preceding this opinion) has served, not only to aid the court, but to abbreviate this opinion, and to confine it to the only subjects which seem to call for separate comment.

### 1. Collateral to Bank Loans—$7,079,000.

[9] The amendment of chapter 688 of Laws of 1892 by chapter 354 of Laws of 1901 has an overpowering significance. That legislation, so far as affects bonds, has remained undisturbed for now over 20 years. It is plain that the Legislature concluded that the former statute was not practicable, and substituted, in place thereof, what it deemed necessary for financial and business requirements. The obligation, therefore, to issue bonds at "the fair market value thereof" disappeared with the statute of 1901. This proposition is well developed in the special master's opinion.

The special master's opinion sets forth reasons why the bonds in question are valid, but he felt constrained to hold otherwise because of the case of Progressive Wall Paper Corp., 229 Fed. 489, 143 C. C. A. 557, L. R. A. 1916E, 563. It is perhaps apparent that this conclusion was somewhat influenced by the special master's delicacy because of his dissent in 229 Fed. at page 500, 143 C. C. A. 568. An analysis of the Progressive Case, supra, will demonstrate that it does not compel the special master's conclusion of invalidity. Certainly, as applying to the collateral pledged when these loans were originally made, the facts are quite different from those in the Progressive Case.

In 1905, Progressive Wall Paper Corporation borrowed $10,000 from the bank and gave the bank its promissory note, with indorsements. The note was renewed from time to time, and partial payments were made. On January 22, 1912, $7,000 was still due, and the note was unsecured, except for indorsements, and on that date a renewal note for $7,000 was given, with the same indorsements as theretofore, except that of one Wing. In place of Wing's indorsement, and as further security, the corporation delivered to the bank as collateral to the note seven second mortgage bonds, of $1,000 each, which were secured by a mortgage on the real estate and plant of the corporation. On November 2, 1911, the directors by resolution authorized its treasurer to issue the bonds secured by the mortgage, supra, "to pay or to secure, as collateral, the payment of the notes of the Corporation, then outstanding or which might be given thereafter." It was in pursuance of this resolution that the seven bonds were delivered to the bank as collateral security.

It will be noted at once that these seven bonds were delivered in January, 1912, as collateral security for a pre-existing indebtedness. It is, of course, true that the renewal note for $7,000, dated January 22, 1912, differed from the old note which fell due that day, in that

Wing was no longer an indorser; but the debt from the corporation to the bank was the same, and the "renewal," so far as concerned the bank, was for the same $7,000 which it then owed. On these facts, it is plain beyond question that the bonds were issued and delivered as collateral to secure the payment of a pre-existing debt.

The opinion in the Progressive, etc., Case, supra, concentrates on this one point. It was the fundamental question with which the court was dealing and that the court did not intend to go beyond the requirements of the facts presented to it is made plain by this significant expression:

"But in this case [referring to 79 Fed. 842] the debt secured was not an antecedent debt. That case decided—what will not be questioned, we take it—that the prohibition under discussion does not prevent the use of bonds as collateral when issued at the time the debt is incurred."

In the case at bar the issue and delivery of bonds were all part of a contemporaneous transaction whereby the banks, respectively, made the loans on the security of the collateral. It seems so clear on the facts that the Progressive Case does not apply that further discussion seems unnecessary. As pointed out by the special master, the note, now held by practically every bank and trust company concerned, is the last of a series, and the history was generally as illustrated by him in the case of Brooklyn Trust Company.

In making the notes, the printed forms of collateral notes in use by the respective banks and trust companies were used, and, while they differed somewhat in phraseology, they all obligated the borrower to furnish such additional collateral as might be required from time to time by any of the officers of the banks and trust companies, and the borrower agreed to furnish upon demand such additional security as might be so required.

[10] On first impression, it seemed that the additional collateral was controlled by the Progressive Case. A more careful analysis, however, puts these bonds in the same legal position as the bonds originally issued and delivered as collateral to the banks. If it be assumed, although not decided, that the transaction typified in the Brooklyn Trust Company illustration was not payment of the old note, but in effect a renewal, then the original agreement must be examined. The bank loaned the money on the promise, inter alia, that B. R. T. would furnish additional collateral. When the additional collateral was furnished, the transaction did not speak as of that date, but as of the date of the original agreement or promise contained in the first collateral note. The promise to furnish additional collateral was a present consideration for an induced loan, and, indeed, as much so as the original collateral, and when, therefore, that promise was performed, the bonds were issued, not as security for an antecedent debt, but as part of the original transaction, on the faith of which the corporation "actually received" money, as required under section 55. In other words, the original promise by reason of which B. R. T. obtained loans from the banks and trust companies cannot be split into two transactions.

The promise was integral, although, from the nature of the transaction, collateral was furnished at different dates. It is obvious that

any other view would chill, and, perhaps destroy, the opportunity of corporations to obtain the aid of financial institutions, particularly at critical times, and would impair the objects sought to be attained by the amendment of 1901, and courts, whenever possible, should endeavor to hold valid legitimate transactions entered into in accordance with long settled business practice.

While the foregoing seems to be the most satisfactory basis upon which to rest this branch of the case, it is not to be construed that the other arguments and reasons advanced are not well worthy of attention. It follows that the conclusions of the special master on this branch of the case are not sustained.

### 2. Collateral under Guaranty Trust Fund—$250,000.

[11] These bonds deposited in 1913 are not subject to attack by B. R. T., nor by the contract creditors, for the reasons stated by the special master under the heading "Note Agreement Collateral—$10,000,-000." If attackable by the purchasers and holders of other refunding bonds, the question, although quite arguable, will probably become academic from a practical standpoint. Every consideration of business morality requires, if possible, the sustaining of the validity of these bonds, and in this court they will be held valid.

### 3. Bonds in Hands of B. R. T.—$5,092,000—When Receiver was Appointed.

[12] None of these are "free assets," except the group making up the $20,000 referred to in the special master's report.

[13] It is contended that the conclusion of the special master as to the $20,000 of bonds and the decision of this court in respect of a similar question in American Brake Shoe & Foundry Co. v. New York Railways, 277 Fed. 261, 281, are unsound. The contention is interesting, but, for the present, the court, on the facts here existent, will agree with its previous view.

4. The status of the bonds pledged as collateral to the receiver's certificates has been so frequently stated by the court that it is necessary only to repeat that no one should question validity for that purpose; but, in addition, as put by counsel for the noteholders' committee, the point "has no practical importance, now that all of the B. R. T. certificates are secured by an equal amount of certificates of the Municipal and Consolidated certificates."

Except as indicated, supra, the report of the special master is sustained. Questions of detail may be presented on the settlement of the decree.